**Opinion issued September 5, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

### NO. 01-12-00640-CV

———————————

**AGNES A. AARON; JIMMY L. ALBERTE AND PATRICIA ALBERTE; ROBERT L. ANSELMI; MIKE ARGO AND DEDE ARGO; GARY ARRANT; ROGER ASHTON; PATRICIA AYERS; ADAM BARR; BILLY BOWEN; JAMES ALLEN BROWN; ROBERT BUNKER; MICHAEL BURGETT; GILBERT CADE AND PORTIA CADE; JOE WILLIAM CANAS; CRISTORAL CARLOS AND BRIDGETTE CARLOS; MARTHA JOYCE CASH; DUDLEY CHAMBERS AND LINDA CHAMBERS; CHARLES P. CHRISTENSEN; WILLIAM S. DAVIS; JUDY DIETRICH; DAVID FAIN AND DANIEL FAIN; SCOTT FLEMING; MELANIE FRICK; AUDREY GAMBLE; ALBERT A. GARCIA, JR.; LEONEL GARCIA; JERRY GARNDER AND GRACE GARDNER; CAROLYN GLOYNA; ROBERT GOEBEL; PAUL HAMILTON AND TONI HAMILTON; DOUGLAS W. HEINTSCHEL AND JOEL HEINTSCHEL; TOM HENDERSON AND SHELLEY HENDERSON; ROY JAMAIL AND MARY JAMAIL; TODD JOHNSON AND JENNIFER JOHNSON; DARRYL KELLER; JOHNNIE LEGGIO, JR.; ROBERT LISTA AND LINDA LISTA; DOUGLAS AND CYNTHIA LONGRON; MARKLE LAND CO., LLC; MICHAEL MATHIS; DANIEL KLING MCNEILL; JONATHAN MULLINS AND KIMBERLY MULLINS; ND&D INTERESTS, LTD; GARY NIXON;**

**ALBERT PEREZ AND ELSA PEREZ; HANA PINARD; CURTIS PLAGENS; SUSAN PLAUMANN; JOHN D. RENTZ; RICHARD ROUNDER AND CLAIRE ROUNDER; ENRIQUE SANCHEZ, JR.; JOE SANCHEZ; GARLAND SCHOEN; JAMES SCOTT AND CAROL SCOTT; BRAD SINGLETARY; GLENDA SPARKS; LLOYD SPEVACK AND DENISE SPEVACK; JIMMY SRADER; SHARON STAFFORD AND O.K. STAFFORD; DAVID STAMPS AND CINDY STAMPS; JOHN J. STOUT; DON STRONG; STEVE SZABO; VIRGINIA TELLER; HAROLD THOMSON AND PATRICIA THOMSON; AMADOR TREVINO; BEVERLY VAN ZANDT; MICHAEL VAUGHTERS AND LINDA VAUGHTERS; FREEMAN VICKERS AND EMILY VICKERS; ROBERT WRIGHT AND STEPHANIE WRIGHT; OSMOND J. YOUNG; AND RAMONA ZURSCHMIEDE, Appellants**

**V.**

**THE PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS, Appellee**

---

**On Appeal from the County Civil Court at Law No. 4**
**Harris County, Texas**
**Trial Court Case No. 977124**

---

### MEMORANDUM OPINION

In this inverse-condemnation and intentional-nuisance case, we determine whether more than ninety property owners have a right to compensation under article I, section 17 of the Texas Constitution for damage to their property resulting from noise, light, and air pollution associated with the Port of Houston Authority's operation of a container terminal along the Bayport Ship Channel. Because the

2

property owners have not established constitutionally compensable damages, we affirm the trial court's judgment dismissing the case.

## Background

The Port of Houston is a 25-mile-long complex of diversified public and private marine terminals, industries, and facilities. The Port Authority, a political subdivision of the State of Texas and a navigation district,[1] is charged with owning, operating, and developing the Port of Houston's public marine terminals, including the Bayport Container Terminal. The Bayport Terminal supports the Port Authority's handling of containerized cargo in the Gulf of Mexico, which is the Port Authority's core business.

Construction of the Bayport Terminal began in 2004; presently, the Bayport Terminal consists of at least 3320 feet of container dock and a 160-acre container yard. Eventually, it will have the capacity to accommodate up to seven container ships at one time with 7000 feet of container dock and 375 acres of container yard.

As explained by the Port Authority's Vice President of Strategic Planning,

> [t]he movement of containers into the Bayport Terminal begins when a vessel docks at the Bayport Terminal. The steamship line contracts with an independent stevedoring company, which rents wharf cranes from the Port Authority to offload the containers from the vessel. The

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(B) (West 2011) (defining "governmental unit" to mean "a political subdivision of this state, including any . . . navigation district"); *City of Seabrook v. Port of Houston Auth.*, 199 S.W.3d 403, 404−05 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd) (explaining constitutional authority pursuant to which Legislature created Port Authority).

3

wharf cranes are operated by employees of the stevedore company, as are yard trucks that move containers from the dock to the container stacks. Once at the stacks, containers are picked up by rubber-tire gentry cranes ("RTGs") and placed in line for delivery. The RTGs are operated by Port Authority employees who are members of the longshoreman's union. Over-the-road semi-tractors (18-wheelers), operated by independent trucking companies, arrive at Bayport Terminal, pick up the containers, depart the terminal, and deliver them to their final destinations. The exporting process works the same way, but in reverse order.

More than ninety property owners in a community north of the Bayport Terminal filed a lawsuit against the Port Authority, alleging that its construction and operation of the Bayport Terminal generates noise, light, and air pollution that "substantially interferes with the use, enjoyment, and benefits of the surrounding residential property" and thereby constitutes a taking of their property for which compensation is required.[2] According to the property owners, the Port Authority's operations violate a local noise-control ordinance, resulting in numerous citations (including nine criminal citations) in the past couple of years.

All of the property owners allege the same harm. Specifically, they allege that they are "unable to sleep in the homes during operations [of the Bayport Terminal], unable to enjoy their yards due to the noise, light and pollution, and unable to maintain normal and routine lifestyles due to the invasion by the Port

---

[2] The property owners also filed a second lawsuit in a different trial court against the Port Authority, alleging that its operation of the Bayport Terminal constitutes negligence under the Texas Tort Claims Act. That second lawsuit is also before this Court on appeal of a ruling on a jurisdictional plea. Today, this Court issues its opinions in both appeals.

[Authority] with its noise, lights, and pollution." The property owners further claim that the value of their properties have been reduced as a result of their proximity to the Bayport Terminal. Their petition asserts that the lawsuit can be properly maintained as a class action because common legal and factual questions predominated and the losses claimed are "almost identical."

The Port Authority answered the lawsuit and filed two pleas to the trial court's jurisdiction. One plea argued that the Port Authority retained its governmental immunity from suit because the property owners failed to plead a valid inverse-condemnation or intentional-nuisance claim by alleging only non-compensable community damages. The other plea disputed whether the property owners established that their properties were uninhabitable and no longer suitable for residential purposes. After a hearing, the trial court granted both of the Port Authority's pleas and dismissed the property owners' claims with prejudice. This appeal followed.

**Standard of Review**

The trial court must have subject-matter jurisdiction before it may hear the property owners' case. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). The property owners bore the initial burden of alleging facts that affirmatively demonstrated the trial court's jurisdiction. *Id.* at 446. The Port Authority properly challenged the trial court's subject-matter jurisdiction in its

5

pleas to the jurisdiction. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The purpose of a plea to the jurisdiction is to "defeat a cause of action without regard to whether the claims asserted have merit." *Id.* It does not involve delving into the substance of the property owners' claims, but rather, examination of whether the claims' merits should be reached. *Id.* Accordingly, in reviewing the trial court's ruling on the Port Authority's pleas to the jurisdiction, we construe the pleadings liberally in the property owners' favor and determine if the property owners alleged facts that affirmatively demonstrate the trial court's jurisdiction to hear their cause. *Villarreal v. Harris Cnty.*, 226 S.W.3d 537, 541 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If the pleadings lack sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not reveal incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the property owners should be afforded an opportunity to amend or to await further development of the case on the merits. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). Conversely, if the pleadings affirmatively negate the existence of jurisdiction, the property owners should not be afforded an opportunity to amend. *Id.* at 227.

## Governmental Immunity and Article I, Section 17

The property owners contend that the trial court has subject-matter jurisdiction because the noise, light, and air pollution generated by the Bayport

6

Terminal substantially interfere with the use and enjoyment of their properties and thereby constitute a taking for which compensation is required under article I, section 17 of the Texas Constitution.

Generally, "[g]overnmental immunity protects subdivisions of the State . . . from lawsuits and liability, which would otherwise 'hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purpose.'" *City of Houston v. Esparza*, 369 S.W.3d 238, 243−44 (Tex. App.—Houston [1st Dist.] 2011, pet. filed) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655−56 (Tex. 2008)). However, article I, section 17 of the Texas Constitution waives governmental immunity from suit and liability for inverse-condemnation claims. TEX. CONST. art. I, § 17; *Burris v. Metro. Transit Auth. of Harris Cnty.*, 266 S.W.3d 16, 19−20 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Immunity is also waived for intentional-nuisance claims that rise to the level of a constitutional taking under article I, section 17. *City of Dallas v. Jennings*, 142 S.W.3d 310, 311 (Tex. 2004). Thus, to determine whether the trial court erred in dismissing the property owners' claims on the Port Authority's plea, we must decide whether the property owners have alleged facts that establish their property was damaged in a constitutional sense. Whether property has been "damaged" in a constitutional

7

sense is a question of law. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 932–33 (Tex. 1998).

**A.  Article I, section 17 does not require compensation for every injury to property**

Although article I, section 17 provides that adequate compensation shall be paid to those whose property is "taken, damaged or destroyed for or applied to public use," not all injury to property is a compensable damage. *See* TEX. CONST. art. I, § 17; *State v. Schmidt*, 867 S.W.2d 769, 778 (Tex. 1993). For more than one hundred years, "courts have construed Article I, Section 17 to allow recovery only if the injury is not one suffered by the community in general." *Felts v. Harris Cnty.*, 915 S.W.2d 482, 484 (Tex. 1996) (citing *Gulf, Colo. & Santa Fe Ry. Co. v. Fuller*, 63 Tex. 467, 470–71 (1885)). In other words, compensation is required only for those injuries "peculiar to a given property." *Fuller*, 63 Tex. at 470. As the Texas Supreme Court explained:

> In the construction of legally authorized public works, it is inevitable that benefits will accrue to the property of some persons and injury will result to that of others. If the injury that thus results from the improvement be only of such nature as is suffered from that cause in common with other property in the same community or section, the damages thus accruing are deemed merely consequential, and no right of action exists. In such cases, it is not considered that the property is "damaged" within the contemplation of the constitutional provision, and the right to compensation is denied. . . .
>
> The question in all such cases is resolved by determining whether the injury is peculiar to the property in question, or is only such as is suffered from the same cause in common with other

8

property in the same section or community; that is, whether the property is "damaged" in the true sense of the constitutional provision.

*Fort Worth Improvement Dist. No. 1 v. City of Fort Worth*, 158 S.W. 164, 168−69 (Tex. 1913); *see also Fuller*, 63 Tex. at 470 (explaining that "[e]very government has the power to construct or to cause to be constructed public works, and in so far as such construction works an injury to the public, it can give no one a right to a private action.").[3]

Similar damage experienced by all or most of the properties in a given "community or section is the quintessential notion of community damage" and will not support individual property owner's damage claims. *Felts*, 915 S.W.2d. at 485. The property owners urge us not to limit our definition of the community in this case to the named property owners; according to them, the Bayport Terminal's operation affects a greater number of properties than are presently the subject of this lawsuit or part of the proposed class of approximately 500 property owners.

---

[3] The Legislature has codified the community-damage rule for condemnation proceedings. TEX. PROP. CODE ANN. § 21.042(d) (West 2011). In estimating the injury or benefit to the property owner when a portion of his or her real property is condemned, "the special commissioners shall consider an injury or benefit that is peculiar to the property owner and that relates to the property owner's ownership, use, or enjoyment of the particular parcel of real property, . . . but they may not consider an injury or benefit that the property owner experiences in common with the general community . . . ." *Id.* Courts apply the same rules in condemnation and inverse-condemnation proceedings. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996).

They suggest that the community extends to the entire City of LaPorte, where their properties are located, and certain other areas of Harris, Galveston, and Chambers counties. They further argue that even if we limit the community to the properties adjoining the Bayport Terminal, the damages suffered are not the same—for example, the properties to the South and West of the Bayport Terminal do not suffer the same loss of use and enjoyment because they either are undeveloped or industrial properties or are buffered by an "extensive levy or bank."

The property owners place too much weight on the location of their properties. "The concept of community [damage] is not primarily geographical." *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). "'Community' in this context means not only where, but, more importantly, what kind. It is the nature of the injury rather than its location that is critical in determining whether it is community." *Schmidt*, 867 S.W.2d at 781. Accordingly, the result in this case turns on whether the noise, light, and air pollution claimed by the property owners is suffered by the community as a whole or by the property owners in some special or unique way and thus is compensable in a constitutional sense.

## B. The property owners' damages are non-compensable community damages

The property owners seek damages for the loss of use and enjoyment of their property due to the protracted invasion of their homes by noise, light, and chemical pollutants generated by the Bayport Terminal. Specifically, the property owners

allege that the Port Authority's "ongoing expansion of the Bayport [Terminal] . . . increasingly expose[s the property owners] to bright lights in the middle of the night, loud banging noises . . . and pollutants from the machinery and ships."

More than one Texas court, including this Court, has concluded that the noise, light, and air pollution generated by a public work is suffered by the community surrounding the public work as a whole. *See, e.g.*, *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 647−48 (Tex. 2004) (holding that bright lights from highway were not compensable under constitution because impact from public works "are compensable only to the extent they are not common to the community"); *Felts*, 915 S.W.2d at 485−86 ("noise emanating from a roadway has a similar impact on the community as a whole" and thus was non-compensable, "quintessential" community damage); *Cernosek Enters., Inc. v. City of Mont Belvieu*, 338 S.W.3d 655, 666 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (plaintiff alleging drilling of wells destroyed "peace and general welfare of the nearby community" and "decrease[d] the property values" failed to demonstrate that "injury affects it in some special or unique way that is different from the injury suffered by the community at large"); *Wilkinson v. Dallas/FortWorth Int'l Airport Bd.*, 54 S.W.3d 1, 17 (Tex. App.—Dallas 2001, pet. denied) (concluding that combined impact from noise, pollution, and disruption of

11

daily activities attributable to governmental activities—use of a new airport runway—was community damage).

Although the property owners argue that the noise, light, and air pollution they suffer is peculiar to their properties given their proximity to the Bayport Terminal, we perceive no meaningful distinction between the property owners' damage allegations and those damages courts have already held to be non-compensable in the construction and operation of other public works. The property owners rely on *Interstate Northborough Partnership v. Texas*, a condemnation case in which the Texas Supreme Court concluded that the community-damage rule did not bar recovery of "increased-proximity damages." 66 S.W.3d 213, 223 (Tex. 2001). There, a commercial property owner sought compensation for the increased proximity of its building to a roadway following condemnation of a part of the commercial property. *Id.* at 217. The Court concluded that the commercial property was injured in a different way, not just to a different degree, than other neighboring properties subject to condemnation for use of the roadway. The commercial property owner had demonstrated that the building's special design made its increased-proximity damages special, not community, through allegations and proof that the building was the most marketable building in the area, its "park-like" setting due to its position away from the road contributed to the building's appeal and provided a pleasant work environment, and the increased proximity to

12

the roadway gave an appearance that the building was not safe. *Id.* at 222−23. The property owners' petition does not allege facts akin to those in *Interstate Northborough Partnership*. The petition contains no allegations that the Bayport Terminal affects the property owners' individual properties in some special or unique way different from the community as a whole; rather, the petition focuses on injuries the property owners allege are suffered in a nearly identical way by the entire neighborhood.

We also are not persuaded by the property owners' assertion that they have suffered damages like those suffered by owners of property fronting railroad tracks. In the historic railroad cases, most occurring before 1900, the Texas Supreme Court held that damages from noise, cinders, vibrations, and other attendant annoyances provided a basis for compensation. *See Gainesville, H. & W. R. Co. v. Hall*, 14 S.W. 259, 259 (Tex. 1890); *Texarkana & N.W.R. Co. v. Goldberg*, 5 S.W. 824, 826 (Tex. 887); *Fuller*, 63 Tex. at 472; *Gulf, Colo. & Santa Fe R.R. Co. v. Eddins*, 60 Tex. 656, 660 (1884). The special damages in these railroad cases arose from the close proximity of the railroad tracks to the properties at issue in the lawsuits. *Felts*, 915 S.W.2d at 486 (distinguishing early railroad cases that "correctly concluded that damages affecting all landowners adjacent to railroad tracks were special" based on "increased exposure to fire" from claims asserting unreasonable interference from impacts shared by community as a

13

whole). As the Port Authority points out, the railroad tracks in the historical cases were placed immediately adjacent to homes, created fire hazards, and destroyed access to property. Of the properties that are the subject of this lawsuit, the nearest property is almost 1000 feet from the Bayport Terminal.

As pleaded, the property owners have experienced noise, light, and air pollution that their neighbors also have experienced as a result of the construction and operation of the Bayport Terminal. We conclude that the injuries of which the property owners complain are, by their nature, a consequence of the Bayport Terminal's operation and are shared by the surrounding area. While some of the property owners inevitably are impacted more severely based on the location of the properties, the difference is one of degree and not of kind. We thus agree with the Port Authority that the damages claimed by the property owners are not compensable. The property owners' class action allegations of injuries shared identically among all of the 500 purported class members in the community indicates that the deficiencies in their pleadings would not be cured by an opportunity to amend. Consequently, we hold that the trial court did not err in granting the Port Authority's plea to the jurisdiction and dismissing the property owners' case.[4]

---

[4] We do not address the property owners' other contentions on appeal—namely, whether the trial court erred in (1) granting the Port Authority's other jurisdictional plea on the issue of habitability and (2) dismissing their request for

## Conclusion

We affirm the trial court's judgment.



Harvey Brown
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

---

injunctive relief. Our conclusion that the community damage rule precludes the property owners' inverse-condemnation and intentional-nuisance claims makes it unnecessary for us to decide whether the property owners established that their properties are uninhabitable. And we do not consider whether the trial court erred in dismissing their request for injunctive relief because they did not plead such a claim.